PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff and the Proposed Class

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CIEARA MUNOZ, individually and on behalf of all others similarly situated,

PLAINTIFF,

V.

LG ELECTRONICS U.S.A., INC., a Delaware corporation,

DEFENDANT.

CASE NO. 2:26-cv-12759

**CLASS ACTION COMPLAINT FOR:**

**(1) VIOLATION OF CALIFORNIA PENAL CODE SECTION 631(A)**

Plaintiff Cieara Munoz, individually and on behalf of the proposed class, alleges as follows. Allegations concerning her own actions are based on personal knowledge. Allegations concerning Defendants' and third parties' internal operations are based on information and belief, supported by the facts stated below.

## I. INTRODUCTION

1. Cieara Munoz went to LG's website to learn about big-screen televisions. She clicked pictures and other visuals to see what LG offered. Those clicks told LG what she wanted to see. They did not give outside advertising companies permission to listen in.

2. But LG's website had another job running in the background. It sent information about the pages a visitor opened and the things a visitor did to other companies. It attached numbers that let those companies recognize the same visitor again. A shopping visit became a record of that person's interests, linked to a lasting digital identity.

3. Some of the software did more than count visitors. It copied the words, pictures, links, and other material displayed on the page, along with records of the visitor's activity. Other software sent the exact page address and the address of the page visited before it. These details let outsiders learn what a person was looking at and connect separate visits into a history.

4. LG chose to put this software on its website. The software began communicating with outsiders before visitors could give informed permission. Calling the software "analytics," using a number instead of a name, or putting a privacy link at the bottom of a page does not change what happened: outsiders received the substance of a shopper's communications with LG without permission.

5. Plaintiff brings this action under California Penal Code section 631(a), on behalf of herself and similarly situated California users. The claim concerns the unauthorized interception of browsing communications and LG's assistance in that interception. The technical allegations below explain what was taken, how it was

transmitted, who received it, and why the conduct was more than ordinary delivery of a webpage.

## II. PARTIES

6. Plaintiff Cieara Munoz is a natural person. On information and belief, she is domiciled in California, is a California citizen, and made the visits at issue while physically present in this judicial district. She used www.lg.com to research big-screen television options, visited several times, and most recently visited earlier in 2026, within the applicable limitations period. She clicked a number of visuals during her research.

7. Defendant LG Electronics U.S.A., Inc. ("LG" or "Defendant") is, on information and belief, a Delaware corporation with its principal place of business in Englewood Cliffs, New Jersey. LG markets and sells consumer electronics in the United States, including televisions, through its U.S. website at www.lg.com/us/ (the "Website"). LG's official corporate materials identify its U.S. headquarters in Englewood Cliffs.

8. On information and belief, LG operates, controls, or directs the operation of the Website and its U.S. marketing integrations. It selected, authorized, deployed, and maintained the challenged third-party code, established the associated vendor and campaign accounts, and benefited from the resulting audience identification, remarketing, and behavioral information. The vendor-specific Website identifiers, LG-branded tracking endpoints, and LG page data described below support those allegations.

9. Plaintiff alleges her own visits and actions from personal knowledge. Allegations about LG's internal decisions, vendor relationships, server-side processing, the application of the Website's common tracking configuration to her visits, and retained information are made on information and belief, supported by expert analysis and the observable technical facts pleaded below. Expert analysis observed the tracking architecture that operated during Plaintiff's visits and captured her browsing communications.

## III. SUBJECT-MATTER JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section 1332(d). The proposed Class exceeds 100 members, the aggregated amount in controversy exceeds $5,000,000 exclusive of interest and costs, and minimal diversity exists. Plaintiff and proposed Class members are California citizens, while LG is a citizen of Delaware and New Jersey under section 1332(c)(1).

11. On information and belief, more than 1,000 California citizens used the Website during the Class Period and had communications intercepted through the common integrations described below without prior consent. LG operates the U.S. shopping and product-research website for a major consumer-electronics business. The challenged code is deployed across commonly accessed pages and activates during ordinary browsing. Those facts support a Class of at least 1,001 members, even without counting repeated visits or multiple interceptions of one visitor's communications.

12. At the statutory amount of $5,000 for one violation per member under Penal Code section 637.2(a)(1), claims of 1,001 members place at least $5,005,000 in controversy. Plaintiff additionally alleges multiple intercepted communications during repeated visits. The jurisdictional amount does not depend on multiplying damages by every script, cookie, or network request. The precise Class size and number of actionable interceptions can be determined from LG's and its vendors' records.

13. The home-state and local-controversy exceptions do not require declining jurisdiction. The sole named Defendant is not a California citizen, and there is no California defendant from whom significant relief is sought whose conduct forms a significant basis of the claims. This action seeks relief against LG for its own deployment and facilitation of the interception architecture.

14. Venue is proper under 28 U.S.C. section 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this district. On information and belief, Plaintiff used a device in this district, communicated with LG from this district, and had those communications captured and diverted from that device here. The alleged

privacy injury occurred here. LG also conducts substantial consumer-electronics business and directs its Website and associated marketing activity to users in this district.

## IV. PERSONAL JURISDICTION: LG'S ACTIVE CONTACTS WITH CALIFORNIA

15. This Court has specific personal jurisdiction under Federal Rule of Civil Procedure 4(k)(1)(A), California Code of Civil Procedure section 410.10, and due process. LG deliberately serves California shoppers through the Website, supplies product information and commercial offers to their browsers, and deploys code that obtains and exports information from those browsers. This action arises directly from that conduct.

16. LG's relevant California contacts include the delivery of the challenged scripts into California devices; the creation, reading, and transmission of persistent visitor identifiers on those devices; the contemporaneous acquisition of users' page selections and browsing activity; and the connection of those communications to advertising, profiling, and visitor-engagement systems. Those contacts are affirmative acts selected by LG and implemented through its Website.

17. On information and belief, LG and the vendors operating through its integrations knew Plaintiff's device was in California when they collected and transmitted her communications. Website requests disclose the device's source IP address to the receiving servers, and LG's U.S. shopping interface uses geographic and shipping-location information. The observed tracking architecture also expressly extracts LG's ZIP-code state and transmits it to a third party with the current page, previous page, and visitor identifier.

18. Specifically, expert analysis observed an Attentive request containing the Website variable LG5_ZipCode with the value 90001, a California ZIP code, together with the current and previous page addresses and a persistent visitor identifier. The significance of that field is that California location information is carried into the tracking stream itself. Plaintiff does not allege that 90001 is her personal ZIP code. On information

and belief, the same integration received the location state associated with her California browsing session.

19. On information and belief, LG and its integrated vendors also used IP-derived geographic information to recognize California traffic and to administer geographic privacy settings, shipping functionality, audience segmentation, and advertising. The Website's California-facing sale-or-sharing controls, its ZIP-code functionality, and the export of location-bearing variables support the inference that LG's collection was undertaken with knowledge of the users' California location, rather than in ignorance of where its code operated.

20. LG continued the collection and onward transmission after recognizing California sessions. It did not merely accept a message from a person whose residence happened to be in California. It caused software to execute on a device physically in California, used that execution to acquire communications from that device, and connected those communications to persistent identities and commercial tracking systems.

21. Briskin v. Shopify, Inc., 135 F.4th 739 (9th Cir. 2025) (en banc), confirms that deliberate electronic collection from a California device, undertaken with knowledge of its location and for commercial exploitation, can establish express aiming. A nationwide business need not favor California over other states before its chosen California contacts support specific jurisdiction. Website accessibility alone remains insufficient; the active acquisition alleged here supplies the additional forum contact.

22. LG's conduct fits that rule. It knowingly delivered the interception machinery into California, obtained California users' browsing communications, and enabled their use in identifiable advertising and behavioral records. Its chosen California collection is the conduct challenged in this case. The fact that LG uses the same architecture elsewhere does not make its California deployment accidental.

23. The claim arises out of and relates to those contacts. Without LG's delivery and activation of the challenged integrations during Plaintiff's California visits, the vendors would not have received her page selections, browsing sequence, and associated

identifiers through the Website. The place of interception is connected to LG's conduct, not merely to Plaintiff's later experience of harm.

24. Exercising jurisdiction is reasonable. LG is a substantial U.S. business that deliberately serves California consumers. California has a strong interest in protecting communications made from devices within its borders. Plaintiff and Class members are located here, relevant electronic evidence can be produced here, and litigating here does not impose an unusual burden on a company conducting nationwide sales and marketing.

## V. PLAINTIFF'S COMMUNICATIONS AND PRIVACY INJURY

25. Plaintiff visited the Website several times to research big-screen televisions and clicked a number of visuals to explore LG's offerings. Each selection communicated her interest in particular displayed information and requested the related page, visual, or product information from LG. The resulting responses communicated LG's substantive product and shopping information to her browser.

26. Plaintiff intended those exchanges to be with LG. She did not intend her television research, selections, page sequence, or displayed content to be copied contemporaneously to outside advertising, identity-resolution, recording, and engagement companies. She did not knowingly authorize those outsiders to acquire the contents of those exchanges before the challenged acquisition began.

27. On information and belief, the Website's common scripts and vendor integrations executed during Plaintiff's visits, captured the page-level content and activity associated with her television research, associated those communications with browser and session identifiers, and transmitted the resulting records to the outside recipients described below. The execution paths operate through ordinary page loading and browsing, including the visual selections Plaintiff made.

28. The interference was concrete. Third parties obtained the substance of Plaintiff's browsing communications, learned her product interests and navigation sequence, and received identifiers allowing those communications to be associated with the same visitor over time. Her communications were exposed to recipients she had not

authorized to receive them. She lost control over their contemporaneous disclosure and subsequent association with behavioral records.

29. Those disclosures invaded Plaintiff's private browsing activity even if the pages themselves were publicly available. A public product page does not make an individual's privately conducted sequence of requests, selections, and responses public. A persistent number also does not make that sequence anonymous when the number enables the recipient to recognize and aggregate the same person's activity.

30. Plaintiff's injury is analogous to the harms historically associated with intrusion upon seclusion and interception of private communications. Unauthorized acquisition and disclosure of browsing history can constitute a concrete injury. See In re Facebook, Inc. Internet Tracking Litigation, 956 F.3d 589 (9th Cir. 2020). Plaintiff alleges actual acquisition and disclosure of her communications, rather than a statutory violation unaccompanied by an invasion of privacy.

31. On information and belief, LG and its integrated vendors retain and continue to use the identifiable browsing records obtained through these systems. Persistent identifiers and expiration settings extending beyond the browsing session permit continued association and exploitation of the intercepted material. That continued retention and use perpetuate Plaintiff's injury. Damages redress the completed interception; appropriate injunctive relief can restrain ongoing unlawful use and further disclosure of the resulting records.

## VI. <u>HOW THE WEBSITE CAPTURES COMMUNICATIONS IN REAL TIME</u>

32. When a browser loads the Website, LG's page instructions cause it to load and execute JavaScript and other resources supplied by outside companies. JavaScript can read the page address, page title, previous-page information, browser storage, and the displayed page structure. It can respond to navigation and interaction events and send additional requests while the visitor continues communicating with the Website.

33. The browser's displayed page structure is commonly called the Document Object Model, or DOM. It contains the elements from which the visible page is assembled,

including text, images, links, and interactive controls. Access to that structure and its changes can reveal the substantive information exchanged and the effects of a visitor's selections. A DOM-based recording can reconstruct the browsing experience without filming the visitor's physical screen.

34. The challenged integrations use outbound HTTPS requests to transmit captured information. GET requests can place captured values in URL query parameters; POST requests can place them in a request body. Request headers and cookies provide additional identifying information. Encryption protects each transmission from unrelated outsiders in transit, but it does not prevent the designated tracking recipient from receiving and reading the information sent to its own server.

35. The interception occurs as the browsing exchange unfolds. The scripts acquire the current page and activity from the browser, generate event messages associated with that page, and transmit them to vendor collectors during the same browsing session. They are not merely reviewing a historical document that LG later chose to send from its own files. LG configured a parallel acquisition path operating at the endpoint where the communications are received, displayed, and acted upon.

36. The Website does not need to expose the full page address through an ordinary HTTP Referer header to accomplish this disclosure. The challenged code expressly reads the current address and inserts it into a query parameter or JSON body. Expert analysis observed requests whose Referer showed only the Website's root while the transmitted payload separately supplied the complete page address. Browser referrer restrictions therefore did not prevent disclosure of the substantive page selection.

37. Expert analysis observed third-party code and network activity beginning upon page load, before an effective opportunity to grant or deny informed permission. Numerous advertising and identity providers appeared in the loaded resources, including Google, Criteo, ID5, StackAdapt, Index Exchange, RTB House, Attentive, FullStory, and iAdvize. The claim rests on the acquisition and transmission mechanisms identified

below; a provider's appearance in a resource list alone is not alleged to establish interception of communication contents.

38. The architecture supplies complementary functions: some integrations acquire exact page information; some capture displayed content and activity; and others associate those records with persistent identifiers or identities recognized across services. The combination makes a sequence of otherwise separate browsing exchanges usable as one identifiable behavioral history.

## VII. GOOGLE: EXACT PAGE INFORMATION AND REMARKETING

39. Expert analysis observed an outbound request to googleads.g.doubleclick.net/pagead/viewthroughconversion. Its payload included a url field containing the complete current LG page address, a ref field containing the prior page address, and a tiba field containing the page title. It also carried an event designation, an auidad identifier, screen dimensions, platform information, and browser-version information.

40. The observed values included the address https://www.lg.com/us/reliable-home-appliances and the substantive title "LG Reliable Appliances: Product Features & Rankings | LG USA." These values demonstrate that the integration transmits the specific information sought and displayed, rather than merely reporting that an unidentified person contacted lg.com. During Plaintiff's visits, the same page-dependent fields transmitted the corresponding television-research pages and titles, on information and belief.

41. Expert analysis observed the DoubleClick IDE cookie in browser storage. The code's remarketing function, the page-specific payload, and the identifying values together support the allegation that browsing events were made linkable to a recognized browser and usable for advertising. Plaintiff does not rest the content allegation on the cookie alone; the explicit page address and title establish the substantive disclosure.

## VIII. CRITEO AND ID5: CONTENT LINKED TO CROSS-SERVICE IDENTITY

42. Expert analysis observed a request to sslwidget.criteo.com/event containing fu, the encoded full current LG page address, and pu, the encoded previous page address. Its parameters also included LG account identifiers, a bundle value, an fpid value, a ceid identifier, and external_advids containing an identity of type id5. These fields combined the browsing event with identifiers usable to recognize the visitor.

43. URL encoding changes the representation of a string so that it can be included safely in a request; it does not remove its meaning or prevent the recipient from decoding it. The fu and pu fields expressly disclosed the current and prior pages. Their disclosure permits Criteo to learn the browsing sequence and the subject matter of the visitor's communications with LG.

44. Expert analysis observed Criteo cookies, including cto_bundle and uid, and an ID5-related request to cdn.id5-sync.com/api/1.0/id5-api.js carrying an id5 cookie value. ID5 is an identity provider registered as a data broker in California. The Criteo event's express inclusion of an ID5 identifier is concrete evidence that page information and an outside identity system are joined in the same transmission.

45. The ID5 script request alone does not establish that ID5 received a particular product page's contents. Its relevance is its identity function and the observable incorporation of an ID5 identity into Criteo's content-bearing event. On information and belief, this arrangement allowed Criteo and the connected identity infrastructure to relate Plaintiff's LG browsing to a persistent visitor identity used beyond the immediate page request.

## IX. STACKADAPT: LANDING PAGE, TITLE, AND PERSISTENT USER NUMBERS

46. Expert analysis observed a request to tags.srv.stackadapt.com/saq_pxl containing landing_url, an encoded complete LG page address, and t, an encoded page

title. The request also contained host=lg.com and sa-user-id, sa-user-id-v2, and sa-user-id-v3 values. User-identifying values also appeared in the associated Cookie header.

47. The request's Origin identified LG's Website, while its ordinary Referer exposed only the root address. The landing_url and t parameters independently delivered the specific page and its substantive title. Thus, the challenged disclosure did not depend on a browser automatically revealing a complete referrer.

48. StackAdapt is a California-registered data broker and advertising-platform provider. On information and belief, its identifying values permit page-level events to be assigned to the same user across sessions and used in programmatic advertising. The observed payload also contained fields named sa_conv_data_css_value and sa_conv_data_image_value. The content claim relies on the legible page and title fields without assuming that every opaque value necessarily represents readable image or text content.

## X. RTB HOUSE AND INDEX EXCHANGE: BROWSING EVENTS AND IDENTITY LINKS

49. Expert analysis observed a POST request to us.creativecdn.com/tags/v2?type=json, an RTB House endpoint. Its JSON body contained su, the complete current LG page address, and sr, the previous page address. It also contained event tags labeled uid and lid, an identifying value in the lid tag, and expiration settings extending approximately one year beyond the event.

50. Because su and sr are transmitted in the JSON body, they disclose the page selection and sequence directly to the recipient. The associated identifiers and extended expiration settings permit those disclosures to remain associated with a visitor after the page closes. Expert analysis also observed creativecdn.com cookies named c, g, and ts, further supporting the persistent identification function.

51. Expert analysis observed an Index Exchange request to dsum-sec.casalemedia.com/rum with cm_dsp_id and external_user_id parameters and identifying cookies including CMID, CMPS, and CMPRO. That request demonstrates

identity-matching infrastructure. Plaintiff does not allege that the request, standing alone, proves interception of product-page contents. Its role is to help connect identifiable browsing records within the advertising ecosystem in which the content-bearing requests operate.

## XI. ATTENTIVE: PAGE SEQUENCE, VISITOR STATE, AND LOCATION

52. Expert analysis observed a request to lg-us.attn.tv/unrenderedCreative containing l, the current LG page address, and r, the previous page address. Other parameters included a persistent visitor id, a page-view value, browser width and height, and a source classification. Associated Website resources included an Attentive tag, impression requests, creative-interaction requests, and event requests.

53. The transmitted body included Website state labeled LG_cart and LG5_ZipCode. The observed ZIP-code value was 90001. Attentive therefore received more than an anonymous count: it received a particular page sequence associated with a visitor identifier and location-bearing Website state. On information and belief, the same integration acquired the corresponding page sequence and available browser state during Plaintiff’s visits.

54. Attentive provides visitor-identification and marketing functions associated with email and text-message engagement. The pleaded interception occurs through its browsing integration and does not depend on Plaintiff having submitted a telephone number, entered an email address, or subscribed to messages. The page-level payload and persistent identifier already create an identifiable record of the browsing exchange.

## XII. FULLSTORY: RECONSTRUCTING CONTENT AND ACTIVITY

55. Expert analysis observed requests to rs.fullstory.com/rec/page and rs.fullstory.com/rec/bundle/v2. The page request expressly identified Base and Url as the current LG page address and Referrer as the previous address. It also carried an LG-associated OrgId and separate UserId, SessionId, PageId, and TabId values, together with viewport and screen dimensions.

56. Those identifiers distinguish the organization, visitor, browsing session, page, and tab to which the recording belongs. They allow multiple event bundles to be assembled into an ordered account of a person's browsing. Screen and viewport information help the recipient interpret how the page was displayed and how recorded activity relates to that display.

57. The bundle endpoint's query included the organization, user, session, and page identifiers, a sequence number, client timing, page-start timing, previous-bundle timing, and activity timing. It also specified ContentEncoding=gzip. Gzip compresses the transmitted data; it does not transform captured communications into non-content information. The recipient can decompress the bundle to process its contents.

58. Expert analysis observed, upon decompression and examination of the recording data, page titles, descriptions, keywords, visible product text, image descriptions, links, styling information, and rendered content. The recording architecture captures that material together with browsing activity and the identifiers needed to associate the material with a user and session. On information and belief, the same architecture acquired the television-related displayed content and activity generated during Plaintiff's visits.

59. This is substantive acquisition of the Website exchange. It enables the recipient to learn what LG displayed in response to the visitor's selections and how the visitor moved through that information. A later replay is generated from the contemporaneously acquired page and event data. The fact that a recipient processes or replays the collected material later does not make its initial acquisition a later, consensual disclosure.

60. On information and belief, LG intentionally enabled FullStory to receive these communications through code executed during its visitors' sessions. LG's ability to review the resulting recordings does not negate the initial receipt by the outside recording provider. The unauthorized recipient acquired communication contents before Plaintiff knowingly agreed to that acquisition.

## XIII. IADVIZE: CONTENT CAPTURE AND AN UNRELIABLE CONSENT STATE

61. Expert analysis observed a POST request to halc.iadvize.com/api/website/8999/visitor-context. Its body included the current url, previousUrl, page type, page category, device height and width, pageId, a vuid visitor identifier, and registerNavigation=true. The payload disclosed that the page category was reliable-home-appliances, independently revealing the subject of the communication in addition to the complete page address.

62. The same request reported cookiesConsent:false. Nevertheless, it transmitted the visitor context, page information, and identifier to an outside iAdvize server. This demonstrates that the collection could occur while the integration itself recorded a negative cookie-consent state.

63. Expert analysis observed a subsequent request to api.iadvize.com/collector/ha/live/events approximately one-half second later. The engagement.tag.loaded event reported cookieConsent:"true" and useExplicitCookiesConsent:false. It used the same source visitor identifier and carried the current page, referrer, project identifier, device identifier, storage designation, browser information, and event timing.

64. A further engagement.page-view.created event followed using the same visitor and device identifiers and page address. The sequence shows the outside system receiving the substance of the browsing context, then recording an affirmative consent label while expressly reporting that explicit cookie consent was not being used. An internally generated label does not establish that a human visitor gave informed permission.

65. The event's storageType value FIRST_PARTY describes a storage configuration. It does not mean that iAdvize is the shopper's intended counterparty, that its remote server belongs to LG, or that the shopper consented to receipt by iAdvize. Plaintiff's claim does not require alleging that she initiated a chat or spoke to an agent; the

captured visitor-context and page-view messages are independently content-bearing communications.

## XIV. WHY THE IDENTIFIERS AND PAGE INFORMATION MATTER TOGETHER

66. The current page, previous page, page title, page category, rendered product content, and interaction sequence reveal what a visitor communicated about and received from LG. They are not limited to an IP address, a connection time, or the bare identity of the Website contacted. In Plaintiff's case, they reveal her television research and the information she chose to explore.

67. Persistent identifiers turn those contents into a linkable history. Criteo's outside identity field, StackAdapt's user values, RTB House's event identifiers, Attentive's visitor id, FullStory's user and session identifiers, and iAdvize's visitor and device identifiers enable events to be associated over time. The transmitted identifiers need not contain a legal name to single out and recognize the same visitor.

68. Not every recipient necessarily receives every field. The mechanisms pleaded above identify the content-bearing transmissions and distinguish them from supporting identity traffic. On information and belief, LG knowingly made Plaintiff's browsing available to multiple outside recipients through these complementary integrations, enabling both immediate acquisition and later identifiable use of the captured communications.

## XV. LG'S NOTICE AND CONTROLS DID NOT SUPPLY PRIOR CONSENT

69. Expert analysis observed the Website initiating third-party communications at page load, before the visitor had an effective opportunity to make an informed choice. The Website's visible notice referred generally to cookies, site functionality, analytics, advertising, and disclosure to partners, and stated that continued use signified agreement to collection and processing. That notice did not obtain Plaintiff's prior informed consent to the particular acquisition of communication contents alleged here.

70. An initial page request precedes any opportunity to read a newly displayed notice. Once the scripts have transmitted the page information or recorded the exchange, a visitor's later navigation cannot retroactively authorize the completed acquisition. Nor does clicking a product visual, in order to obtain product information from LG, objectively establish agreement to contemporaneous interception by outside companies.

71. Expert analysis observed the Website's privacy state recording SaleOfInfo:false and confirmed:true after use of the "Do Not Sell or Share" control, while Functional, Analytics, Advertising, and Marketing remained designated Auto. Content-bearing tracking continued. This configuration shows that the sale-or-sharing control did not operate as a comprehensive barrier to the challenged acquisition and transmission.

72. A sale-or-sharing preference and consent to intercept communications are different permissions. The continuation of tracking after that preference supports the allegation that the Website's controls did not reliably prevent unauthorized content acquisition; Plaintiff's claim also independently rests on interception occurring before informed consent. A vendor's automatic classification of a category cannot substitute for Plaintiff's assent to that vendor's receipt of her communications.

73. The iAdvize sequence supplies a concrete example: the system transmitted page context when cookiesConsent was false, then reported cookieConsent as true while useExplicitCookiesConsent was false. These values describe software behavior, not an affirmative act by Plaintiff agreeing to interception. LG's deployment allowed the transmission despite the absence of the consent section 631 requires.

74. Plaintiff did not give prior informed consent to the challenged third-party acquisition. On information and belief, the same was true for Class members subjected to the common pre-consent execution paths. A Website policy or later recorded preference cannot cure an interception already completed without the required consent.

## XVI. <u>OUTSIDE RECIPIENTS AND LG'S ASSISTANCE</u>

75. LG was the intended recipient of Plaintiff's product-research requests and the sender of the resulting product information. The challenged outside companies were

additional recipients. Their direct acquisition occurred because LG supplied the scripts, authorized their execution, exposed the page and browser state to them, and configured the vendor accounts and collection endpoints.

76. The content-bearing advertising and identity integrations were not merely alternate names for LG. Google's remarketing infrastructure, Criteo's use of an outside ID5 identity, StackAdapt's advertising identifiers, RTB House's persistent event records, and Attentive's visitor-identification functions support the allegation that these recipients acquired and used identifiable browsing information for their own advertising, identity, and engagement operations, as well as providing benefits to LG.

77. On information and belief, those recipients combined or used the acquired content and identifiers in their commercial systems, including audience recognition, remarketing, attribution, and profiling. The browser itself contacted their distinct collection servers. The content was therefore acquired by recipients outside the shopper's intended exchange, rather than being confined to LG's own receipt of a request.

78. The FullStory and iAdvize integrations independently demonstrate receipt of substantive communications by outside systems. Even if LG characterizes a particular provider as a service contractor, that label alone does not establish that the visitor knowingly consented to contemporaneous acquisition or that the provider was a participant in the intended shopper-to-LG exchange. The recipients' actual acquisition, uses, and ability to act independently are material facts alleged here, rather than a presumed consequence of the word "vendor."

79. LG deliberately enabled the acquisition. The outbound requests identify LG's pages, organization or project identifiers, account values, and LG-branded resources. The disclosures are recurring features of deployed code, not accidental messages created by Plaintiff. LG's affirmative selection and operation of that architecture constitutes assistance to the third-party interception, irrespective of LG's own status as a party to the underlying shopping communications.

## XVII. CLASS ACTION ALLEGATIONS

80. Plaintiff seeks certification under Federal Rule of Civil Procedure 23(a) and 23(b)(3) of the following Class: All California citizens who, while physically present in California during the period beginning one year before the filing of this action and ending on the date of Class certification, used www.lg.com/us/ and had the contents of their browsing communications acquired through one or more of the content-bearing third-party integrations described in this Complaint before giving consent to that acquisition.

81. Excluded are LG; its officers, directors, and employees; entities controlling or controlled by LG; the judicial officers assigned to this action and their immediate families; and persons whose only recorded contact with the Website arose from an automated crawler or bot. If necessary, Plaintiff seeks certification of subclasses defined by the particular content-bearing integration or common consent configuration, with separate representation as appropriate.

82. The Class is numerous. On information and belief, it includes at least 1,001 members and substantially more. The Website serves a large California consumer market, and the challenged integrations execute through common page-loading and browsing paths. Joinder is impracticable. Membership can be evaluated using Website, event, session, consent, and vendor records, together with appropriate geographic and citizenship evidence.

83. Common questions include whether LG deployed the challenged integrations; what substantive page and interaction information each integration acquired; whether acquisition was contemporaneous with the Website exchange; whether recipients were outside participants rather than parties to that exchange; whether the common execution paths began before valid consent; whether LG assisted the acquisition; and what statutory and equitable relief is available.

84. Additional common questions concern whether persistent identifiers linked the captured communications across visits; whether the ordinary Referer restrictions were circumvented by explicit page fields; whether FullStory's bundles contained rendered

page information; and whether automatic consent labels and privacy-control settings supplied authorization for the communications actually transmitted. These issues can be resolved through shared source code, configuration, network protocols, vendor documentation, and business records.

85. Plaintiff's claim is typical. Like other Class members, she engaged in ordinary product research through the Website, communicated page selections to LG, and had the substance of those exchanges acquired through the common tracking architecture before informed consent. Differences in the television or other product viewed do not change the challenged collection mechanism or the requirement of prior consent.

86. Plaintiff will fairly and adequately protect the Class. Her interest in establishing the interception and obtaining redress aligns with the Class's interests. She has no known conflict with Class members and is represented by counsel experienced in privacy and class-action litigation.

87. Common questions predominate over individual questions. Liability turns principally on what LG deployed, what the shared collection paths acquired, when they acquired it, and how the common consent mechanisms operated. Individual event histories can establish the applicable integration, page communication, and consent state without relitigating the operation of the architecture for every person. Plaintiff seeks integration-specific subclasses if material differences require them.

88. A class action is superior. The cost of separately investigating and litigating the Website's technical architecture would make individual claims impractical, while common adjudication avoids repeated expert analysis and inconsistent decisions. The California-limited Class and identifiable Website integrations provide a manageable scope. Statutory relief can be administered using uniform legal standards and the underlying event and session records.

89. Plaintiff also seeks appropriate classwide equitable relief under Rule 23(b)(2) to the extent LG's ongoing unlawful retention, use, or disclosure of intercepted communications is established. LG's challenged deployment and handling of the resulting

records apply generally to affected users. Any equitable subclass will be limited to persons facing the ongoing conduct to be restrained.

## XVIII. FIRST CAUSE OF ACTION

### Violation of California Penal Code Section 631(a)

### By Plaintiff and the Class Against LG

90. Plaintiff incorporates the preceding allegations as though fully set forth here.

91. California Penal Code section 631(a) prohibits specified unauthorized interception and acquisition of communications, use of information so obtained, and assistance in the prohibited conduct. Plaintiff proceeds principally under the prohibition against intentionally reading or attempting to learn communication contents without all-party consent while the communication is in transit or being sent or received, and under the provision imposing liability for aiding or agreeing with others to commit the prohibited acts.

92. Plaintiff's and Class members' browser communications with LG traveled through electronic communications networks and were being sent and received in California. They included requests identifying the selected pages and information sought, responsive Website contents, and selections and activity within those exchanges. The page-specific information and recordings described above communicated substantive meaning beyond mere routing information.

93. The third-party content recipients intentionally acquired and learned, or attempted to learn, the contents or meaning of those exchanges while they were being sent, received, displayed, and acted upon. Their code obtained current page addresses, prior-page information, titles, categories, rendered content, or activity associated with the exchanges and contemporaneously transmitted that information to their collection systems.

94. The acquisition was intentional. The integrations were programmed to read specified fields, assign identifiers, generate page and interaction events, and transmit the resulting payloads to designated recipients. Repeated page events, session identifiers, and

recording-bundle sequence numbers establish deliberate operation. The code did not receive the challenged information through a random or unsolicited act by Plaintiff.

95. Plaintiff and Class members did not consent before the challenged acquisition. Initial execution preceded an effective informed choice, and later notices, continued browsing, automatic category settings, or internally asserted consent labels did not authorize interception already underway or completed. LG's consent to its own integrations was not consent by all parties to the underlying communications.

96. The advertising and identity recipients were not intended parties to Plaintiff's communications with LG. On information and belief, they acquired the information for independent commercial processing, including recognition, advertising, attribution, and behavioral use. The acquisition cannot be immunized merely because LG arranged for a simultaneous copy to be delivered to them. See In re Facebook, Inc. Internet Tracking Litigation, 956 F.3d 589 (9th Cir. 2020).

97. LG knowingly aided and agreed to the prohibited acquisition by selecting and embedding the third-party code, configuring the vendor and campaign identifiers, permitting access to page content and browser state, causing the scripts to execute during the shopping exchanges, and facilitating their transmissions to outside servers. Without that assistance, these recipients would not have obtained Plaintiff's Website communications through the pleaded paths.

98. LG's liability does not depend on characterizing LG itself as an outsider to its own product-research exchange. It rests on LG's intentional assistance to additional recipients who acquired those communications without the required consent. The aiding provision addresses that distinct conduct.

99. On information and belief, LG and the advertising and identity recipients also used information obtained through the unauthorized acquisition to recognize visitors, associate their product interests with persistent identifiers, build or update audience records, and support remarketing and related commercial activity. Plaintiff alleges those uses insofar as they involved information obtained in violation of section 631(a).

100. The actionable conduct began on devices in California and acquired communications being sent or received here. The claim therefore rests on California interception and assistance connected to California communications. The location of a recipient's server outside California does not negate the acquisition initiated from the California endpoint or LG's deliberate deployment there.

101. Plaintiff and Class members suffered concrete invasions of their browsing privacy as a direct result. Their substantive exchanges were acquired and disclosed to unauthorized recipients and associated with identifiers supporting continued recognition and use. Penal Code section 637.2 supplies a civil remedy without requiring proof of financial loss; Plaintiff independently alleges the concrete privacy injury necessary for federal standing.

102. Plaintiff seeks the greater of $5,000 per proven violation or three times any proven actual damages under section 637.2(a), together with appropriate relief restraining ongoing violations under section 637.2(b). She does not seek duplicative recovery for different technical descriptions of the same actionable acquisition. The proper number of violations will be determined from the communications and conduct proven.

103. This cause of action concerns interception of communication contents under section 631(a). It does not assert a private claim under section 638.51 based only on the collection of dialing, routing, addressing, or signaling information. The specific page titles, content, navigation sequence, and recordings pleaded above establish the substantive communications at issue.

## **PRAYER FOR RELIEF**

Plaintiff requests judgment against LG as follows:

a. Certification of the Class and appropriate subclasses; appointment of Plaintiff as Class representative and her counsel as Class counsel; and appropriate Class notice.

b. A determination that LG violated California Penal Code section 631(a) through the conduct alleged.

c. The greater of statutory damages of $5,000 per proven violation or three times proven actual damages under California Penal Code section 637.2(a), without duplicative recovery.

d. Appropriate injunctive relief under California Penal Code section 637.2(b) restraining ongoing unlawful interception and use or disclosure of unlawfully obtained communications, including appropriate deletion or sequestration of unlawfully obtained records to prevent continuing violations.

e. Reasonable attorney fees where authorized by applicable law, including California Code of Civil Procedure section 1021.5 if its requirements are satisfied, and recoverable litigation costs.

f. Prejudgment and postjudgment interest to the extent allowed by law.

g. Such other relief as the Court deems just and proper.

Dated: October 30, 2026

PACIFIC TRIAL ATTORNEYS, APC

By:________________________

Scott J. Ferrell

Attorneys for Plaintiff and the Proposed Class